24-2555, thank you. Mr. Hildebrand? Thank you, Your Honor. I understand you have reserved three minutes for rebuttal? Yes, I have, Your Honor. Alright, you may proceed. Thank you. May it please the Court, Clark Hildebrand on behalf of Plaintiff Appellant James Harker. Defendants conspired to exclude James Harker, an experienced electrician in the commercial production industry, from double-the-line positions because of the color of his skin. Yet defendants argue that Harker cannot challenge their discriminatory hiring practices because Harker did not submit a nonexistent application for positions that were not posted. Given his experience, how does he qualify for this program? He would qualify, for example, for the DTL gaffer position because that's the position that he has held the gaffer role in some productions, but he wants to obtain more experience and hold that position more often, and so being in the DTL gaffer position would give him more exposure and the ability to do so. There's also the financial... Well, I have a question. It might benefit him because it would benefit even a person who had been a gaffer 100 times, but isn't the goal of the program to give exposure and experience to people who lack that? No, Your Honor. As we alleged in the complaint, the apprenticeship component of the program is just a sham as shown by various positions with specific allegations. For example, the DTL electrician on the meta-production as well as the prop master DTL and the key group DTL. Well, he's not interested in those jobs, right? He's only interested in the gaffer job, right? For the 2022 meta-production, he was interested in the DTL gaffer position. The other ones show that this is not a true apprenticeship program, and for future productions, which again, he was, of course, excluded from the DTL gaffer position for the meta-production, but he's also been excluded from every subsequent production, both from the non-DTL and the DTL roles. And he, of course, would prefer to have some employment versus no employment there. And so even for positions such as DTL electrician or DTL best boy exhibit. You say he's been excluded, but there's no evidence that he even applied for any subsequent position. Is there? There's no application, Your Honor. He can't submit an application. Why can't he? Because defendants have chosen not to have an application process, which is this court in cases such as Grant v. Bethlehem Steel and Brown v. Coach Storrs indicated. When you don't have an application process, there's a serious risk that what you're doing is trying to hide or mask discrimination. Here it's expressed racial discrimination that's going on. When an employer- I mean, he knows that this program exists after this particular production he's on, and he's not shy about talking to his bosses, right? He says, hey, these guys should be in the union, that kind of thing. He never says, hey, I would like to be in the DTL program, right? So why isn't that a signal that he did not actually want to be in the DTL program? First of all, the way that this industry operates, you don't express interest that just would be irrelevant to the production company's hiring, but also something ideal was aware that he wanted to fill electrical positions. There's even a settlement agreement that's something ideal to enter into with the NLRB that required something ideal to offer him electrical positions for a period that extended almost five months even after the meta-production, but he wasn't offered any position whatsoever. So then that goes back to cases such as Do No Harm v. Pfizer, which this court decided earlier this year and vacated the main district court decision that the district court in this case relied upon, and as the court ruled in that case, when an individual- in that case, there was even an application process for a program Pfizer was running that allegedly racially discriminated against whites and Asians, and in that case, the plaintiffs, as this court ruled, did not even need to apply for the program as long as they allege that they are ready and willing to fill the position- Yeah, but they were individuals who were qualified, who were qualified for that level position and had expressed an interest in attending and were members of the organization, right? Because it was a standing issue as well, whether the organization could bring it on behalf of its members, and my understanding is what this court found was that you don't have to identify who they are, but you have to have individuals who are qualified and who have expressed an interest in those positions in some way, and I don't see the evidence of your client either qualifying for an internship position when he has been a gaffer or electrician for 27 years, and whether he even expressed an interest in any of these positions. Can you point to the record, anything in the record that suggests he expressed an interest after the events in question? The way that this- first of all, they're not internship positions as we allegedly complained as we showed with the allegations there, but second of all, something ideal already knew that he wanted electrical positions. There would have been no point of being futile for him to express any sort of interest. The employer would have just shrugged it off. They already knew that he was interested in these positions. It simply didn't matter because this was a racially discriminatory program. In cases such as Teamsters from the Supreme Court, if it would be futile for you to express an interest or apply because of a racially discriminatory aspect of a program, then you don't need to apply or express interest in the program. I see that the- there are indications that the program is seeking out BIPOC folks. Is there something in the record where the program operators say we only want BIPOC folks? Yes. Your Honor, I think repeatedly throughout the complaint, we cite to even the website for AICP, which describes the program, describes it as wanting to change demographics of the industry, and that it only applies for BIPOC individuals, which defendants describe as black indigenous people of color. It says only. Sorry. It says only. Only black indigenous people of color. And as we allegedly point, all of the DTL positions, while they had different levels of experience, the one thing that they all had in common was that they would all be BIPOC. Where's that mandatory provision in the operative complaint? I'd be glad to look and provide that on your record. Yeah, thanks. Sorry. And the Petrosino principle ought to apply here. Plaintiff Harker squarely falls within it. This court, in cases such as Dawson v. New York City Transit Authority, 624F Appendix 763 from 2015, applied that, and that case was an example of where the individual wasn't seeking a promotion, they were simply seeking a position equivalent to a position that they'd previously held in this court, so that Petrosino is what should apply, and that if it's futile to apply or express interest for a position, then an individual has standing to challenge the program. And the same applies here. Something ideal was aware that Harker is interested in electrical positions. That's the very reason that they hired him to be the best boy electrician on the production. The idea that he needed to do something more to give an expression of interest is blind to the fact that he didn't need to do so for something ideal to hire him as the best boy electrician, which usually would be the second in charge on the production behind the gaffer, which usually there's just one gaffer. So here, Harker would have been, were it not for the racial discrimination of defendants, the logical choice to be considered to be the DTL gaffer as that ended up being the second electrician in charge on this production. Instead, though, defendants hired an individual that was BIPOC but lacked any sort of experience, wasn't even able to coil an electrical cord, and hired that individual to be the DTL gaffer. For other positions, such as the DTL electrician, defendants hired someone who did have quite a lot of experience in the industry, which goes against the fact that it's inconsistent with the idea that this is just an apprenticeship program. You can't just stamp a label on something and say this is an apprenticeship program and use that to hide or mask a program of racial discrimination. He would not have been interested in the DTL, the lower DTL positions, right? From the amended complaint, it looks like the job he wanted was the gaffer job. That's the only job better than the one he got, right? Of course, this production owner, he would have preferred to have the DTL gaffer position, which is better paid for future subsequent productions. And as to that position, the complaint alleges that the person was utterly unqualified and clearly less experienced than Mr. Harker. Yes, that person was unqualified. But then it goes to whether or not, and then I think it's enough for us to allege that this is a sham apprenticeship program, but that's supported by facts of the complaint that this DTL program, you couldn't be hiring people who are experienced for DTL positions if this is a true apprenticeship program. And then for subsequent productions, of course, Harker would be interested in positions such as DTL electrician. I see my time has expired for opening for the rest of the meeting. We'll see you shortly. Now we'll hear from counsel for the, we have separate counsel for the defendant groups. Mr. Degasen. Thank you, Your Honor. May it please the court. Samir Degasen for the non-employer defendants. This case involves a challenge by a 27-year veteran of the commercial production industry for his failure to be hired as an apprentice gaffer on a single commercial in 2022, even though he concedes that he did not do or say a single thing that would have made any of the defendants aware of his interest in gaffer work. His sole basis for standing is his claim made for the first time in litigation that he would, quote, like to increase his experience as a gaffer. That's the only allegation in the complaint about his interest. And he identifies no case where such a vague, after-the-fact proffer has been deemed sufficient for standing. And I think to hold otherwise would open the door to a limitless conception of standing. So can you, I mean, his view of the hiring process is basically that there is sort of a bank of resumes, I take it, that the employers are aware of the people who have sort of the potential qualifications for these jobs and there's no application process. So I guess, what is he supposed to do under those circumstances? He's supposed to at least, I think, express some interest in gaffer work. So he, I think it's clear he's had a long-time relationship or has had a relationship with this employer. He's in regular communication with them. He's worked in the industry for 27 years. So he's clearly had some opportunity to say at some point, you know, and even an informal expression, you know, I'm interested in gaffer work. I'm interested in the general category of this kind of work. But I guess his allegation is that that's totally irrelevant to the way the hiring process works. That the hiring process is just the employer selects from the people it knows about. I don't think he alleges that it's completely irrelevant. I think he says the employer selects from a group of resumes. But I don't think he says anywhere in the complaint that there's no ability to informally express your interest or the employer wouldn't care about that. He said in his reply brief in here today that the employer already knew he was interested. That's not in his complaint. There is no allegation that the employer already knew he was interested. And so, again, this is, I think, a very fact-specific case that's tied to this pleading is really deficient because he doesn't, as the district court said, he doesn't express even an interest in the general category of work. Even after he learns about the DTR role, he doesn't say I would like a DTR role. I mean, it seems like the way that Petrosino approached this is to say if there is no formal application process, you are excused from applying. So why isn't that where we are? Well, I think two things about Petrosino. One is even in Petrosino, the amount of affirmative stuff that the plaintiff did was far more than that. And the court said the standard of Petrosino cannot be established merely with evidence that a plaintiff generally requested promotion consideration. They have to apply at least informally for the specific positions they knew were vacant. Yeah, I think in Petrosino, the plaintiff lost. But it sets out a rule that says if there's no formal application process, you don't have to apply. Well, it sets out a rule that says you do have to informally indicate your interest for anything you know might become available. And that's why she lost. And here, he would have known that something ideal hires gaffers. And so at some point, you've got to informally express your interest. Otherwise, I think their ready and able requirement just drops out entirely. And, you know, that I don't think can be right. And I also note that here we have a complaint where even during the litigation, he doesn't have, you know, the only thing he says, and this is at A18 in paragraph 37 of his complaint, is he would, quote, like to increase his experience as a gaffer. So he doesn't say how, he doesn't say when. He doesn't even specifically tie that to the 2022 commercial. So this, I think, is a uniquely deficient and threadbare complaint, and I think can just be resolved on that fact-specific ground. I'd also like to address the qualification issue, because I think that is significant. I don't think it was fully addressed in what we heard from the other side. So the eligibility criteria in the complaint, that's at paragraph 30 at J17, and it says it's for a candidate who has not previously had access to a business, but is qualified in the role. So to be clear about what that means, you know, they are qualified as a gaffer. They may have a lot of experience as a gaffer. They just don't have the connections in the commercial production industry, and the complaint describes examples of that as being someone coming from television or someone coming from music videos. So that could be someone who actually, you know, is very experienced as a gaffer, just doesn't have the networks and connections. Then he alleges that he has 27, this is at J17, paragraph 34, he has 27 years of experience in the commercial production industry. So he concedes he doesn't meet the program criteria, because he does have, and I think it's fully acknowledged and conceded, networks, connections in the commercial production industry. So he doesn't qualify in exactly the same way that I wouldn't qualify for an internship, you know, program for college students. But he says it's a sham, and he said today, oh, we really specifically plead that. But if you actually dig into the complaint, there are only two relevant allegations. That's on paragraph 61 and paragraph 66. He sets out two people, Baty and Johnson, that he said had industry experience or, quote, had connections in the industry. He mentioned someone else, which is Jordan, but that person he just says was qualified as an electrician, doesn't say anything about connections in the industry. So his connections to industry, he just has these two allegations. He doesn't say what he means by industry. So maybe that's commercial production industry. Maybe that's generally being an electrician. Maybe that's music videos, who knows. He doesn't say how much experience they have, is extensive, three months, six months, a year. He certainly doesn't allege that they have 27 years of experience like he does. So all that proves, at most, is that there are two people who maybe shouldn't have been hired, who maybe didn't meet the eligibility criteria. I'm not even sure it proves that. I mean, I think these people could well have, you know, met the eligibility criteria based on these vague allegations. But even if it shows that, two people out of seven who maybe shouldn't have been hired doesn't mean that Harker does meet the criteria, or doesn't mean the program is a complete sham, and therefore he would be able to apply, or he should have been able to apply. So I just don't think the pleading is at all sufficient on that. And the last thing I'll say about this is, even if you disagree with us on that, any injury there cannot be traceable to the non-employer defendants. At paragraph 31 of the complaint, this is at A16, he specifically says the production company is responsible for identifying, hiring, and educating the DTL candidates. And so, you know, if he claims there's some problem in the hiring, the hiring the wrong people, they're not administering the program properly, that has nothing to do with the non-employer defendants. Well, I mean, I think what he's alleging is that it's a sham program, right? That actually the criteria are not the stated criteria, it's basically a race-based program. So if you were to take that as true, why are the... Yeah, I don't think you can just take that as true, because I think he has to allege specific facts, and these are the only two facts, so I don't think you take it as true. But even if you take it as true, the sham nature of it derives from, in his view, the fact that these individuals shouldn't have been hired. So the sham nature of it derives from the way in which, allegedly, something ideal is administering it. They're hiring people in a way that don't meet the program criteria. He never says anything about the program criteria that we... You know, his link to the non-employer defendants is, you know, you financially support the program. But the program we financially support is the one that's described, you know, at JA-17 at paragraph 30. That's the one which he's not eligible for. So that, any injury there is due to the administration of the program, and we're not, based on his own complaint, we're not part of the administration of the program. Thank you, Your Honor. Thank you, Counselor. We'll hear next from Mr. Ryder. May I proceed? Good morning, Your Honors. May it please the Court. Counsel, my name is Nicholas Ryder, and I represent Defendant Appellee Something Ideal, LLC, that does business under the trade name Missing Pieces. Your Honors, we've already heard argument from Appellant's counsel, from the non-employer counsel. I just want to, as counsel for the only employer in this case, I just want to bring a couple facts to the panel's attention. This Court has held, as Your Honors are aware, that the Petrosino exception is narrow. That means it's the exception. It's not the rule, and it should be applied sparingly. And if there was ever a plaintiff who should not be entitled to the Petrosino exception, it's Mr. Harker. He admits that prior to the meta-commercial, he was a 27-year industry veteran with experience in the commercial production business, including work as a gaffer. He admits he knew prior to the meta-commercial that a gaffer was the lead electrician on a commercial production, which means there's always going to be gaffer work offered on a commercial production. And he admits that prior to the meta-commercial, pursuant to an NLRB settlement agreement with Something Ideal, that my client promised to offer him future job opportunities on future commercial productions. So he knew future job offers were coming from Something Ideal. And with all those facts admitted, if there was ever a plaintiff who needed to engage in the modest act, as this Court called it in Jackson Bay, of just raising his hand and saying, hey, you know what, Something Ideal? I'd like to be considered for a gaffer the next time. In this industry, could he have done that, for example, somewhere in the record is the email that says, we'd like to offer you the position that he was offered on that job. Could he, in this industry, would it be acceptable to say, hey, thanks, that's really great. I'm really interested in being a gaffer. I think they say in the email, the gaffer is Bob or whoever the gaffer is. We're offering you this best boy job. Would it be appropriate and reasonable to say, great, I'll take this best boy job on this one. I'd really like to be considered for gaffer positions in the future? Absolutely. I mean, if by reasonable and appropriate, if Your Honor is asking, would there be any backlash or would that be considered rude? I mean, is that something that people might do in this industry? I don't know. I've never been in a hiring hall kind of job like that, right? Well, it's not in the record, Your Honor, but I'd submit yes. And I think what's in the record and clear is that there was some kind of a relationship. I wouldn't call it a longstanding relationship, but he had previously worked for something ideal. It's not as if the supervisor didn't already have his contact information and vice versa. It's not as if in that email, the plaintiff wrote back, hey, who are you, supervisor? I've never heard from you before. And the importance of the NLRB settlement agreement speaks volumes here. He knew future job offers were coming. I wonder if you could run the facts that you're identifying through Petrosino. Because I guess Petrosino says, to be excused from the specific application requirement, an employee must demonstrate that, one, the vacancy at issue was not posted, and two, one of the options is the employee had no knowledge of the vacancy before it was filled. So talking about the specific META production, I guess I'm looking at it and I'm seeing those criteria as satisfied, despite the facts that you're pointing out. But tell me how you're running it through Petrosino differently. Yes, Your Honor. So the, I will call it 2A of Petrosino, is a knowledge factor. And the knowledge factor is not satisfied by the plaintiff here. Because he knew that job offers were coming. He knew that Something Ideal employed gaffers. He knew that the gaffer was the lead production. I mean, he didn't even know about the META production until he received an email saying, do you want to be best boy on this particular production, right? Right. But before that, he admits that he knows Something Ideal employs gaffers, and that Something Ideal promised in a settlement agreement to offer him employment opportunities. So is the question under Petrosino whether it's knowledge of the, the quote is knowledge of the vacancy. Does he have to be aware of this specific vacancy? Or is it your argument that in this industry, knowledge of vacancies generally that they just sort of come up is sufficient? Because it does say you have to, the employer can, the employee can show he had, quote, no knowledge of the vacancy. And I don't think it's disputed that he had no specific knowledge of this specific vacancy. So we'd have to read that to say, you know, no knowledge that vacancies generally were coming up. Well, I'd submit that Petrosino itself, the facts of Petrosino are instructive on that. This court imputed knowledge onto the plaintiff in Petrosino because the positions at issue were actually already filled. They were just filled by acting managers. And so they imputed the knowledge of the word acting manager to mean that the plaintiff in Petrosino must have known that the positions weren't filled permanently. But doesn't everybody agree the first time he learns of this DTL position at all is when he's working on the made-up production? As alleged by the plaintiff, yes. Although he also alleges that it's publicly, that the program is publicly available on the internet. Okay, so that seems like the first time he's aware of a DTL GAFR position, which is effectively the number two, right? Or can be effectively the number two. You're adding in another layer of GAFR after the principal GAFR. The first time he learns that job exists is when he's working on the job. As alleged by the plaintiff, however, and our argument is he was aware of something ideal's employment of GAFRs, the position he so ardently claims he seeks. And he could have engaged in the modest act of raising his hand, engaging with the employer that he already had a relationship with, that he already had a pathway of communication with, that he knew was going to offer him future work. And he could have engaged in that modest act. And he does not compare favorably to the plaintiffs in Jackson Bay and in Moose Lodge, frankly. So is your point, for example, when he first learns that this person that shows up as a GAFR has no experience and it's double the line. They put two GAFRs, an experienced one with an intern. And he learns about this. And his first complaint isn't, hey, I want to be an intern like that. I want that double the line position. His first complaint is, oh, these people aren't getting their union benefits, right? I feel bad for them. So is it your point that he should have said, hey, instead of being a best boy, I want to be the double the line GAFR? Is that what your point is, that these are ongoing positions and he could have expressed an interest then? Yes, Your Honor. I see my time's up. But if I may be permitted to answer Your Honor's question. Yes, that is one of our arguments. But that's just the beginning. And this relates to the retaliation claim that's alleged against my client. And this, again, I think really is telling about the plaintiff's true intent here. He admits he knew about the double the line program when he started working on the commercial. He admits, as Judge Kovner pointed out during argument from prior counsel, that there was these conversations going on between him and his supervisor, specifically about the double the line program. And even then, he never raised his hand. He never engages in the modest act of saying, I'd like one of those positions. And that's particularly relevant to the retaliation claim asserted against my client. I'm glad you raised the retaliation claim. And we're going to hold you up here for another couple of minutes. Because I want to ask you about that. I'm having trouble seeing, I understand you make an alternative argument, but I'm having trouble seeing how he does not have standing to bring the retaliation claim. The retaliation claim is, I complained to this employer. And from that point forward, they didn't hire me anymore. I understand, as I say, you have an alternative argument, but do you wish to defend the dismissal for the lack of standing of that claim? Yes, Your Honor. There's lack of standing for failure to apply. You still need to apply to and submit to the alleged race-based policy for retaliation. I think he doesn't just claim he wasn't hired for DTL jobs. I think he claims something ideal didn't give him any more work at all. Right, but again, he never inquired at all about any of the positions or any employment opportunities with something ideal after his alleged protected activity. We've also raised an argument that he didn't engage in a protected activity in the first place. Because as the panel pointed out earlier, first, he has two alleged comments that he claims constituted the protected activities in this case. Nondescript questions that he asked about the program, I think we can dispense with those pretty quickly because it doesn't even allege what the questions are. But one is, he alleges that he informed the production supervisor that depriving DTL employees of benefits owed to them under the CBA was racially discriminatory. Our position, as set forth in our brief, is that that's not the alleged comment that he actually alleges making. The alleged comment he actually alleges making is that something ideal's pay practices, this is paragraph 144 of the amended complaint, that something ideal's pay practices violated the collective bargaining agreement. Yeah, but then the next paragraph after that, he says, because the DTL category is defined by race, he expressed to the production supervisor that depriving DTL employees of benefits is racially discriminatory. So he doesn't just say the first paragraph, he says the second paragraph, according to him. Yes, we think the two paragraphs are inconsistent and that the second paragraph, as set forth in our brief before the court, was his characterization of what he actually said to the supervisor. But this is a complaint. We're not at summary judgment. So he's allowed to allege what he said, and it doesn't have to be on information and belief because he was there. Yes, Your Honor. So understanding that we're not looking for evidence at this point, we're looking for sort of Twombly-Iqbal sufficient allegations. How are those two paragraphs, as my colleague points out, taken together not sufficient to make that a complaint about discrimination? I'm not going to stand up here and say if the court determines that paragraph 145 represents the actual words uttered to the supervisor, that that doesn't constitute a protected activity. I know better than to do that before this panel. I will remind the court, though, that there is still an application requirement for a retaliatory failure to hire a claim. My client can't retaliate against someone who never applied for the job in the first place. But you guys had an agreement, I mean, as alleged, an agreement to hire him for future work, and then you stopped doing it. Well, his recourse, then, is to allege breach of contract or to file a claim with the National Labor Relations Board. It's not to come before this court under a Title VII failure to rehire a claim, and he hasn't done that either. And I think this court can take notice of the fact that he didn't raise his hand even after he knew about the Double the Line program. I mean, that is telling of his real intent here. Why didn't he do it? It wouldn't have been hard. He's already engaged with his supervisor about the program. Why can't he say, hey, for the next gig, I'd like to be considered for one of these Double the Line positions? Thank you, counsel. Thank you very much, Your Honors. We'll hear rebuttal from Mr. Hildebrand. You have three minutes. Thank you, Your Honor. First, I'd like to address the express racial discriminatory parts of the program and address some points, address my comments on the other side. First, so the program, as described and alleged and on AICP's website, is expressly racially discriminatory. At A14, quote, to hire a BIPOC candidate is the purpose of the program. At A24, it's to create opportunities for BIPOC crew members. At A11 to 12, it's to change the demographics of the industry. That's how defendants themselves describe the point. I believe the question was where in the complaint is it alleged that it's only for BIPOC? I think that paragraph 22 says that the website says they agree to cover the cost to hire a BIPOC candidate to work alongside. So there is some language in the complaint, I see that. I know, I appreciate Judge Miriam answering my question, but I'd like to hear it from you. I'd like to help your honor as well. And so at A24, that's where we allege that this was a sham apprenticeship program. And of course, this is a case, this is at the motion to dismiss stage. And under Carter, the court has to accept the allegations as true. And we've quite additional facts such as the different experience levels of people in DTL positions that would show that this was, in fact, a sham apprenticeship program. Thank you. And then to turn to some of the points raised by defendants, they repeatedly say that, you know, jobs would be coming if you just raise your hand. Where are those jobs? Harker has not been hired for any position, whether DTL or non-DTL, since the December 22 production. Furthermore, it is not necessary, and it's not even how hiring is done at all, that you need to informally raise your hand. That would simply be irrelevant to the practices that are how defendants choose to hire individuals to these positions. Justice Harker didn't informally raise his hand before he was hired for the best boy position on the 2022 meta-production. Furthermore, under Petrosino, using informal means endorsed by the employer is only one of the two options that an employee has to satisfy Petrosino. The other is that the employee only learned about the position after it had already been filled. And that was the case for the 2022 meta-production, where Harker did not know about the DTL program until the production was already underway and the DTL gaffer had already been hired for that production. But why couldn't he express an interest for, I mean, this is an ongoing program. Why couldn't he express an interest to participate in the double the line internship program? I mean, there's no method that defendants have provided, formal, informal, to express interest in the double the line. To the person who hired him in the first place for this, for the best void position. I mean, it would be, first of all, it'd be ignored because he wouldn't satisfy it under the racial discrimination aspects of it. And they've also known. I mean, again, they've known for two years now that he has interest in DTL positions, but they'd never hired him for either a non-DTL or a DTL position there. And as well, they knew that he was interested in electric positions, as shown by the settlement agreement. And there's nothing to suggest that he wouldn't be interested in DTL electrical positions as well. Indeed, for the DTL gaffer. It's hard to imagine that someone who has the level of experience he has would say, I'd like to be an intern now. It'd be like me saying, I really want to go back to being a law clerk. What I started doing, I don't want to date myself, a long time ago. Six or eight years ago. You know, it makes no sense. And a judge hiring me might say, well, you know, you're on the Second Circuit. Why do you want to be a law clerk? I understand, Your Honor. But you don't pay interns better than you... If this were a true internship program, you wouldn't pay the DTL gaffer intern better than you're paying the best clerk. I mean, it'd be like if you paid the intern better than the judge. And that wouldn't make any sense, just as it makes no sense here. This is truly an internship program that you're paying the DTL gaffer better than you're paying the best FOIA electrician. And it's almost like we'd pay permanent law clerks just a little bit more than term clerks. So that's more akin. He's not trying to be the project manager. He's trying to be a gaffer, right? Well, I think, Your Honor, that would be because of the years of experience that the term law clerks would have versus here the DTL gaffer had no experience. And really, I mean, the equivalent, Your Honor, would be that usually when you're hiring law clerks, my understanding is you go on office or you submit an application. Here, however, what the employer has done would be like a judge just going out and start emailing law school graduates and offering them just members of one race. And if Congress provided a cause of action, a individual who alleged that he or she was willing to fill the law clerk position would have standing to challenge the racially discriminatory hiring practice of such an individual. So to conclude, Your Honors, unless there are further questions, the court should reverse the district court's decision and hold that Harker is standing to challenge defendants racially discriminatory DTL initiative. Ruling otherwise would bless the commercial production industry's outlier practices, which have no application process and provide a roadmap for racial discrimination. Thank you. Thank you to all counsel. We'll reserve decision.